**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AL FLORA, JR.,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:13-1049** |
| **v.** | : | |
| | | **(JUDGE MANNION)** |
| **LUZERNE COUNTY and ROBERT LAWTON, County Manager, in his official capacity,** | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M

Pending before the court are the plaintiff's motion for a preliminary injunction, (Doc. No. 4), and the defendants' motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted, (Doc. No. 9)[1]. Based upon the court's review of the motions and related materials, the plaintiff's motion for a preliminary injunction will be dismissed and the defendants' motion to dismiss the plaintiff's complaint will be granted.

## I.   PROCEDURAL HISTORY

By way of relevant background, the plaintiff filed the instant civil rights action on April 22, 2013, in which he alleges that he was removed from his

---

[1]The court notes that the defendants have relied on materials outside of the pleadings in support of the factual background set forth in their motion to dismiss. In accordance with the standard for considering a motion to dismiss, the court has not considered the outside materials in deciding the defendants' pending motion.

position as the Chief Public Defender for Luzerne County in retaliation for his efforts to secure funding for the Luzerne County Office of the Public Defender, ("OPD"), and to enforce the rights of OPD clients.

On May 6, 2013, the plaintiff filed his motion for preliminary injunction, (Doc. No. 4), along with a brief in support thereof, (Doc. No. 5). The defendants filed a brief in opposition to the plaintiff's motion, (Doc. No. 7), along with supporting exhibits, (Doc. No. 8), on May 29, 2013.

On June 4, 2013, the defendants filed a motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief may be granted. (Doc. No. 9). A brief in support of the defendants' motion was filed on June 18, 2013. (Doc. No. 11). After having been granted an extension of time to do so, (Doc. No. 13), on July 19, 2013, the plaintiff filed a brief in opposition to the defendants' motion to dismiss. (Doc. No. 14). A reply brief was filed by the defendants on August 2, 2013.

## II.    LEGAL STANDARDS

### a.    Preliminary Injunction

Federal Rule of Civil Procedure 65 governs the granting of injunctive relief, such as temporary restraining orders and preliminary injunctions. Injunctive relief is not granted as a matter of right. Kerschner v. Mazurkewicz, 670 F.2d 440, 443 (3d Cir. 1982). It is well-established that injunctive relief is extraordinary in nature and should issue only in limited circumstances. See

2

American Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426–27 (3d Cir. 1994), cert. denied, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). Such relief should not be granted unless the movant, by a clear showing, carries the burden of persuasion. Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). See also Adams v. Freedom Forge Corp., 204 F.3d 475, 486 (3d Cir. 2000) (moving party bears the burden of establishing the factors for injunctive relief). The Third Circuit has indicated that "[u]pon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3d Cir. 1937). Whether injunctive relief is granted is at the sound discretion of the trial judge. Orson, Inc. v. Miramax Film Corp., 836 F.Supp. 309, 311 (E.D.Pa. 1993).

In determining whether to grant injunctive relief, courts within the Third Circuit consider the following factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006). See also United States v. Bell, 414 F.3d 474, 478 n.4 (3d Cir. 2005) (citing ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)).

While each factor need not be established beyond a reasonable doubt,

they must combine to show the immediate necessity of injunctive relief. Stilp v. Contino, 629 F.Supp.2d 449, 457 (M.D.Pa. 2009) (citing Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d Cir.2002)). While the moving party must produce evidence sufficient to convince the court that all four factors favor injunctive relief and the court must endeavor to balance all four factors, "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." Jones v. Taylor, 2013 WL 1899852 (M.D. Pa. May 7, 2013) (quoting In re Arthur Treacher's Franchise Litig., 689 F.2d 1137, 1143 (3d Cir.1982)).

### b.    Motion to Dismiss

The defendants' motion to dismiss is brought pursuant to the provisions of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly,

550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *See* Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. *See* Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. *See*, e.g., Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

## III.   DISCUSSION

### a.   Defendants' Motion to Dismiss[2]

Taking the allegations in the plaintiff's complaint as true, as the court must do in considering the defendants' motion to dismiss, the Pennsylvania Public Defender Act ("Act") requires each County to appoint a public defender, who is directed to provide representation to indigent criminal defendants where constitutionally mandated. 16 P.S. §§9960.3, 9960.6.

Until April 17, 2013, the plaintiff was the Chief Public Defender in Luzerne County, Pennsylvania. The plaintiff had been with the OPD as an attorney since 1980. In 1990, the plaintiff became the First Assistant Public

---

[2]The court takes the parties' motions out of order, as a finding that the plaintiff's complaint fails to state a claim upon which relief can be granted necessarily disposes of his request for a preliminary injunction for which he must establish probability of success on the merits of his claims.

Defender. In March 2010, the plaintiff became the acting Chief Public Defender. In May 2010, prior to the adoption of the Home Rule Charter, the plaintiff was appointed the Chief Public Defender by the Luzerne County Board of Commissioners. As the Chief Public Defender, the plaintiff oversaw both units of the OPD, which consisted of the Adult Unit and the Juvenile Unit.

The OPD is charged with providing representation to indigent criminal defendants in seventeen magisterial districts, the Luzerne County Court of Common Pleas, and the state appellate courts. The OPD is also responsible for providing representation in state parole, county probation/parole revocation, and mental health civil commitment proceedings.

When the plaintiff became the Chief Public Defender, the OPD was experiencing problems due to insufficient funding. The plaintiff's highest priority was improving juvenile representation in the wake of federal court proceedings involving two judges of the Luzerne County Court of Common Pleas. To this extent, state records revealed that between 2003 and 2008, approximately 50% of juveniles appeared in Luzerne County Juvenile Court without the benefit of counsel–nearly ten times the state average. Virtually all of the unrepresented juveniles were adjudicated delinquent.

In October 2009, the Pennsylvania Supreme Court ordered vacatur and expungement of all Luzerne County juvenile adjudications of delinquency or consent decrees between January 1, 2003, and May 31, 2008, of which there were several thousand.

According to a May 2010 report of the Interbranch Commission on Juvenile Justice established by Act 32 of 2009 and a December 2011 report by the Joint State Government Commission's Task Force and Advisory Committee on Services to Indigent Criminal Defendants, the Luzerne County OPD's lack of resources contributed to the alleged disregard for due process in juvenile proceedings.

As part of his efforts to improve the quality of juvenile representation in Luzerne County, the plaintiff began to obtain grant funding from the Pennsylvania Commission on Crime and Delinquency and the Luzerne-Wyoming Counties Mental Health/Mental Retardation Program. These grants allowed the plaintiff to create a separate Juvenile Unit by hiring two attorneys, two social workers, one secretary and one investigator to handle exclusively juvenile cases. However, even with this funding, the plaintiff was forced to transfer a senior attorney from the Adult Unit to the Juvenile Unit in order to meet staffing needs. Despite the fact that funding for the position existed in the OPD budget, the defendants refused to allow the plaintiff to replace the senior attorney in the Adult Unit, until he filed a lawsuit.

With a full complement of staff in the Juvenile Unit, the plaintiff was able to implement a comprehensive process for handling juvenile cases and determining juvenile eligibility for OPD representation. With the resources provided by outside grant funding and the County, the OPD has been able to intervene in juvenile cases at an early stage, thereby diverting these cases

8

from court and preserving the resources of the Juvenile Unit, the County and the judiciary.

However, defendants have refused to provide the plaintiff with the necessary resources to ensure that the Adult Unit can also provide constitutionally adequate representation to its clients. To this extent, in June 2010, the plaintiff provided defendant Luzerne County and its Commissioners with a report relating to the significant resource shortfall at the OPD and its consequent inability to provide the representation required by the Public Defender Act and the United States and Pennsylvania Constitutions. Plaintiff listed the deficiencies of the OPD to include: caseloads for OPD attorneys that far exceeded national maximum caseload standards; an insufficient number of clerical staff; the County's failure to fill staff vacancies; the lack of any appellate counsel resulting in staff lawyers, many of whom were not versed or trained in appellate practice, doing their own appeals; physical facilities that were undersized, overcrowded, poorly maintained and not suitable for client conferences or maintaining client confidentiality; and severely inadequate information technology. The plaintiff's report was discussed with the County Commissioners shortly after its receipt, after which several of the Commissioners called it "demeaning."

In July 2010, at the request of the Commissioners, the plaintiff provided the County and Commissioners with a short-term plan to correct the OPD's staffing deficiencies and the resulting problems. Specifically, the plaintiff

9

recommended the creation of a Juvenile Unit, hiring appellate and additional trial attorneys and support staff, and active caseload monitoring. Although the Commissioners allowed the plaintiff to create the Juvenile Unit, as discussed above, they refused to authorize any additional legal staff for the OPD in the 2011 budget.

Plaintiff's budget proposal for 2012 again requested additional legal and support staff. Again, the Commissioners denied the plaintiff's request for additional staff.

In December 2011, the plaintiff made the decision to restrict the type of clients that the OPD would represent due to overwhelming caseloads. The OPD then turned away applicants with lower level offenses who were not incarcerated.

In the meantime, in January 2012, Luzerne County reopened its budget pursuant to its transition to Home Rule. The Interim County Manager gave all county offices a bottom-line figure within which to allocate their funding. The OPD was threatened with a nearly 12% decrease from its 2011 budget. After the Council approved a 2% tax increase, the plaintiff was able to rearrange his allotment to a 6.7% decrease from 2011 in order to maintain staffing levels. This required the plaintiff to reduce his expert witness budget from $100,000 to $72,000. Plaintiff submitted his revised 2012 budget under protest due to the insufficiencies of the OPD.

By early 2012, the OPD had several vacancies due to lawyer

resignations, which increased the already overloaded OPD lawyers. However, the plaintiff could not fill these positions because the County implemented a County-wide hiring freeze in February 2012. Defendant Lawton continued this freeze and prohibited the plaintiff from hiring replacement staff when he took office at the end of February 2012.

By April 2012, the OPD was down five lawyers and had critical deficiencies in support staff, office space, and office technology. Because of these deficiencies, the plaintiff filed a State court funding action on April 10, 2012, against Luzerne County and defendant Lawton. A hearing took place in that action in May 2012, after which the defendants permitted the plaintiff to advertise and fill the funded vacancies in the OPD office.

On June 15, 2012, the Luzerne County Court of Common Pleas granted the plaintiff's motion for peremptory mandamus relief and granted the following relief:

> (a) Defendants shall not prevent the public defender from filling vacant fund[ed] positions;
> (b) Defendants shall review the operations and staffing of the county public defender's office and provide a plan to meet the constitutional obligations for indigent representation in accordance with the principles set forth in the foregoing opinion;
> (c) Defendants shall submit a report to this court within a reasonable time outlining its plan to meet its constitutional obligations in regard to the operation, staffing and expenses of the office of public defender;
> (d) The defendant, county manager, is directed to provide adequate office space in order to permit confidential communications between assistant public defenders and indigent criminal defendants within 30 days of the date of this order . . .

11

This order also directed the OPD to resume accepting all qualified applicants which it had turned away as a result of the plaintiff's December 2011 decision to restrict the type of clients that the OPD would represent. The court further directed the parties to address the needs of the OPD in mediation, in which the parties engaged until January 29, 2013, when the defendants petitioned the court to release the parties from mediation and proceed to trial.

Even without additional funding, the plaintiff implemented a number of administrative and professional policies and created a training program for new OPD lawyers. The plaintiff applied for a dozen grants to assist the OPD and used funds that had been budgeted for the positions that remained vacant for months to purchase computers for all of the OPD attorneys and to purchase new and more functional case management software. The plaintiff also found funds to pay for a temporary receptionist. The plaintiff initiated the practice of sending OPD lawyers to weekday morning initial bail hearings at the county jail, which resulted in a significant reduction in the length of time arrestees spend in jail, saving the County money. In addition, the plaintiff repeatedly redistributed work assignments in the office to even out some of the work load for attorneys who covered the busiest magisterial district courts. Despite this, the caseloads of OPD lawyers continues to rise.

Throughout the state court litigation, the plaintiff never ceased trying to work within the County's procedures to obtain proper funding and staffing for the OPD, but was always denied. On more than one occasion, counsel in the

state court action had to intervene to get defendants to respond to plaintiff with respect to issues facing the OPD, even those that did not require any additional allocation of funds, with counsel for the County suggesting that all of the plaintiff's request for County action being copied to County Counsel.

With respect to his claim of retaliation, the plaintiff alleges that in December 2011 and January 2012, local newspapers reported that the plaintiff stated that he would sue the County, if necessary, to get adequate funding for the OPD. At a meeting about the proposed budget revision in January 2012, the County's Interim Manager, Thomas Pribula, stated that he believed that the plaintiff would sue the County because the County would not augment the OPD's budget. He further noted that the Public Defender is selected by the County Manager with County Council confirmation, and that they could replace the plaintiff if there was "lack of cooperation."

At a County Council meeting on April 10, 2012, the day the plaintiff filed the state court action, a member of Council asked, "Should he be actually working for the county at this time?" Defendant Lawton declined to answer because of the pending litigation. A discussion followed as to whether the plaintiff had been properly appointed to his position under the new Home Rule Charter.

Also on April 10, 2012, the plaintiff filed a federal court action in which he sought injunctive relief to prevent the defendants from firing him in retaliation for filing the state court action. See Flora v. Luzerne County, Civil

Action No. 3:12-0665. In response to the plaintiff's complaint, the defendants entered into a stipulation which indicated that, although the Home Rule Charter required the County Manager to nominate a candidate for the position of Chief Public Defender for confirmation by the County Council, defendant Lawton had not made any such nomination. The stipulation provided that the plaintiff would remain the acting Chief Public Defender until defendant Lawton made that nomination. In light of the stipulation, the plaintiff agreed to withdraw his federal court action and a stipulated order of dismissal was signed by the court on March 11, 2013.

Despite the provisions of the Home Rule Charter and the federal court stipulation, defendant Lawton did not nominate anyone to fill the part-time Chief Public Defender position held by plaintiff. Instead, defendant Lawton proposed and the County Council approved an amendment to the OPD budget to add a full-time position of Chief Public Defender and to change the existing part-time Chief Public Defender position held by plaintiff to a part-time Assistant Public Defender position at plaintiff's current salary.

Plaintiff applied for the full-time Chief Public Defender position. After he did so, in a meeting about staff and budget issues that included the plaintiff and defendant Lawton, defendant Lawton suggested that the plaintiff leave the staffing issue for the "new" Chief Public Defender to determine.

In March 2013, after the dismissal of the federal court action, the County interviewed the plaintiff and five other candidates for the new Chief Public

Defender position. The interview panel included the mediator of the plaintiff's state court action. The panel members asked the plaintiff about his lawsuit against the County and its effect on the plaintiff's relationship with defendant Lawton. The panel later identified three candidates for the position, including the plaintiff. The plaintiff was then scheduled to be interviewed by defendant Lawton.

In the meantime, during a routine meeting with court administrative staff regarding the proper docketing of juvenile matters, the plaintiff learned that over 3000 of the juvenile adjudications that the Pennsylvania Supreme Court had ordered expunged in October 2009 were still on the court docket. The plaintiff brought this to the attention of defendant Lawton, the District Attorney, the Court Administrator, the nonprofit counsel who had represented the juveniles before the Supreme Court and the Berks County Senior Judge Arthur E. Grim, who had been appointed by the Supreme Court to serve as special master to review juvenile adjudications in Luzerne County. As a result, the District Attorney wrote to defendant Lawton on March 1, 2013, noting the seriousness of the situation and requesting that the County take immediate action to comply with the Court orders. That day, defendant Lawton berated the plaintiff for disclosing the matter to persons outside of the County administration.

On March 14, 2013, the plaintiff informed defendant Lawton that the OPD, at the request of Judge Grim, would perform an audit or "spot check"

15

of the juvenile records at issue to determine whether they were being properly expunged. Defendant Lawton again berated the plaintiff for allowing Judge Grim to direct the function of the County office.

On April 9, 2013, defendant Lawton asked the County Council to approve his selection for full-time Chief Public Defendant, Steven Greenwald, who had been a part-time Assistant Public Defender. Council confirmed the appointment without any discussion.

On April 17, 2013, the plaintiff reported the results of the OPD audit of juvenile records to the District Attorney and Judge Grim, which revealed serious inaccuracies in the records. Of the nearly 300 checked, one third remained "open" in the court dockets, nearly half of these were still on the docket but marked "expunged" and only a minority of those checked were completely expunged and removed from the docket. In addition, many of the records from 2008 through 2011 were entered improperly, often stating that juveniles had been convicted of charges on which they had been acquitted.

At the end of the business day on April 17, 2013, defendant Lawton informed the plaintiff and County Council by email that the plaintiff was "relieved of [all] duties as Acting Chief Public Defender, effective immediately"; that plaintiff's County employment would "terminate at close of business April 29, 2013", and that First Assistant Public Defender Tim Fannick would serve as Acting Chief Public Defender pending Steven Greenwald's assumption of duties pursuant to his confirmation.

On April 19, 2013, the District Attorney sent Judge Grim a full account of the juvenile record issue, including the results of the OPD spot check.

County Council members have made statements in the media regarding the plaintiff's demands for additional funding and his decision to bring suit against the County. For instance, Councilman Rick Morelli "noted Flora has had significant accomplishments as chief public defender but has been controversial because he sued the county . . ."

Moreover, in response to criticisms of the nomination of Steven Greenwald to the position of Chief Public Defender, Councilman Rick Morelli stated "I respect their opinion, but they need to understand that council can only vote for or against the manager's nominee [. . .] It would be unethical for the council to vote down a nominee just to appoint someone council specifically wanted."

At the time that defendant Lawton proposed the change to the OPD budget to create the new Chief position and demote plaintiff, defendant Lawton intimated that there would be a "new" Chief Public Defender under the proposed budget, but would not offer further details due to the plaintiff's pending litigation.

Upon information and belief, the plaintiff was the only candidate recommended by the panel who had experience managing a public defender office; Mr. Greenwald was chosen to replace plaintiff because defendants objected to plaintiff's demands for greater funding for the OPD and his

17

decision to bring suit; and plaintiff's dismissal during the last two weeks of his term as Acting Chief Public Defender was designed to punish plaintiff for his advocacy for OPD resources, the state court action, and his report to the District Attorney and Judge Grim of the failure of County personnel to complete the court-ordered juvenile expungements.

Based upon the above allegations, the plaintiff brings the instant three-count complaint: Count I - First Amendment Retaliation; Count II - Wrongful Discharge in Violation of Public Policy; and Count III - Violation of Pennsylvania Whistleblower Law. Through his complaint, the plaintiff is seeking preliminary and permanent injunctions restoring him to the position of Chief Public Defender; costs and attorney's fees; and any other relief which the court deems just and proper.

In their motion to dismiss the plaintiff's complaint, the defendants argue that the plaintiff has failed to properly allege a First Amendment retaliation claim. (Doc. No. 11, pp. 5-13). Specifically, the defendants argue that the plaintiff was performing his official duties when he filed the lawsuit seeking additional funding for the OPD and when he reported the failure of the court administration to properly expunge juvenile records in Luzerne County. As such, the defendants argue that the plaintiff was not acting as a citizen and his actions are therefore not entitled to First Amendment protection.

"To state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the

protected activity was a substantial factor in the alleged retaliatory action."
Lakkis v. Lahovski, 2014 WL 346986 (M.D. Pa. Jan. 30, 2014) (quoting
Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)). "The first factor is a
question of law; the second factor is a question of fact." Id.

"The [Supreme] Court has made clear that public employees do not
surrender all their First Amendment rights by reason of their employment.
Rather, the First Amendment protects a public employee's right, in certain
circumstances, to speak as a citizen addressing matters of public concern."
Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). If public employees speak in
the course of their employment, "the employees are not speaking as citizens
for First Amendment purposes, and the Constitution does not insulate their
communications from employer discipline." Id. at 421. However, if an
employee speaks as a citizen on a matter of public concern, "[t]he question
becomes whether the relevant government entity had an adequate
justification for treating the employee differently from any other member of the
general public." Id. at 418.

"[T]he question of whether a particular incident of speech is made within
a particular plaintiff's job duties is a mixed question of fact and law." Foraker,
501 F.3d at 240. The majority approach has interpreted this language to mean
that "the ultimate question of whether speech is made pursuant to a public
employee's official duties is a question for the Court to decide, whereas the
question of whether certain factual circumstances exist is a question

amenable to resolution by a jury." Baranowski v. Waters, 2008 WL 4000406, at *19 (W.D.Pa. Aug. 25, 2008) (citations omitted).

The inquiry required under Garcetti to determine whether an individual is acting pursuant to his official duties is a "practical one" that does not turn on a given employee's formal job description. Garcetti, 547 U.S. at 424-25. Expression does not have to fall within a public employee's job description or respond to an employer's inquiry in order to constitute speech made pursuant to the speaker's official duties. Weintraub v. Board of Education, 593 F.3d 196, 203 (2d Cir. 2010). Factors relevant to the analysis include the employee's duties, the impetus for his or her speech, the setting and subject matter of that speech, and the identities of the individuals to whom speech is addressed. See Brown v. Tucci, 2013 WL 2190145 (W.D. Pa. May 20, 2013) (citing Weisbarth v. Geauga Park District, 499 F.3d 538, 546 (6th Cir. 2007)). Consideration may also be given to "whether the speech was made inside or outside of the workplace and whether it concerned the subject matter of the speaker's employment." Id. (citing Handy-Clay v. City of Memphis, 695 F.3d 531, 540-41 (6th Cir. 2012)).

With respect to the instant action, the defendants do not contest that the plaintiff spoke on matters of public concern when he sought to secure additional funding for the OPD and sought to remedy the failure to expunge juvenile records as directed by the court. The defendants argue, however, that the plaintiff was not acting as a citizen in taking these actions and therefore

20

they are not entitled to First Amendment protection. The court agrees.

In Garcetti, the Court held that a public employee does not "speak as a citizen" when he makes a statement pursuant to his "official duties." 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Id. The issue in this case then turns on whether the plaintiff's actions in filing the state court action and reporting the failure to expunge juvenile records related to his official duties as the County's Chief Public Defender. See Garcetti, 547 U.S. at 421-23; Foraker, 501 F.3d at 240.

As the Chief Public Defender, the plaintiff argues that he "went up the chain of command" to remedy the OPD funding issues. He initially took steps to inform the County and its Commissioners, his employer, about the additional funding needed in order for the OPD to meet its obligations to its clients under the Pennsylvania Public Defender Act. When the plaintiff and County officials disagreed over the funding issue, as the Chief Public Defender, the plaintiff made the decision to restrict the OPD's caseload. Ultimately, the plaintiff took action through the courts to obtain relief. The State court funding action was filed by the plaintiff in his capacity as the Chief Public Defender in order to cure the deficiencies of the OPD and provide adequate representation to those individuals entitled to the services of the OPD.

The plaintiff argues in his brief opposing the defendants' motion to dismiss that he did not bring the State court funding action "in his official capacity," and that to state otherwise would confuse his basis for standing with his job duties. To this extent, the plaintiff argues that "[his] pleadings in that case never alleged that he was acting in his 'official capacity', they alleged that [he] had standing to seek a writ of mandamus by virtue of that position."

Despite the plaintiff's argument, it is clear from the state court action that the plaintiff brought the action in his official capacity. In fact, the caption reads "AL FLORA, JR., in his capacity as Chief Public Defender of Luzerne County." According to the plaintiff, this designation in the pleadings is inconsequential, in that his position allowed him standing to bring the suit, but did not require him to do so. However, the issue is not whether the plaintiff's duties as the Chief Public Defender required him to file the action, but whether the action related to his official duties as the Chief Public Defender. See Garcetti, 547 U.S. at 421-23; Foraker, 501 F.3d at 240. To this extent, it is "the Public Defender, unlike the general public, [that] has the statutory obligation to provide legal representation to financially eligible criminal defendants." Dauphin County Public Defender's Office v. Court of Common Pleas of Dauphin County, 849 A.2d 1145, 1148 (Pa. 2004) (citing In re Hickson, 821 A.2d 1238, 1243 (Pa. 2003)). Plaintiff acknowledges as much in his filings when he alleges that "[a]s the Chief Public Defender, Plaintiff

Flora is responsible for managing the OPD, which includes overseeing its lawyers and employees, establishing its policies, managing its budget, and ensuring its compliance with constitutional, statutory, and professional/ethical guidelines." (Doc. No. 8, Ex. A, ¶ 7). Moreover, the plaintiff states in his filings that the defendants had no legitimate interest "in preventing the *Chief Public Defender* from taking every lawful step necessary to ensure that indigent defendants in Luzerne County are afforded constitutionally adequate representation." (Doc. No. 5, p. 8) (emphasis added). As it is the public defender and not the average citizen that has the obligation to ensure that eligible criminal defendants are provided adequate legal representation by the OPD and the plaintiff admits that it was his responsibility to oversee the office, as well as its policies and budget, the plaintiff could not have filed the state court action in any other capacity than as that of the Chief Public Defender and clearly his actions in doing so related to his duties as the Chief Public Defender.

The plaintiff further argues in his opposing brief that he could not have been acting in accordance with his official duties when filing the state court funding action, as his official duties did not include filing lawsuits against his employer. However, the plaintiff's argument goes against Garcetti, in which the court emphasized that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties

for First amendment purposes." Garcetti, 547 U.S. at 424. In fact, the plaintiff would be hard-pressed to find any job description that includes bringing suit against one's employer as an official job duty. Nonetheless, under certain circumstances, doing so may be necessary for the individual to fulfill his/her duties of the job for which he/she was hired, such as in the case at hand. Thus, the contents, or lack thereof, of the plaintiff's job description does not conclusively establish whether his actions occurred within the scope of his official duties.

Speaking to the matter of the juvenile records, the plaintiff alleges that he discovered the failure to expunge juvenile records through a "routine" meeting as the Chief Public Defender with court administrative staff regarding the proper docketing of juvenile matters. The plaintiff does not indicate that these routine meetings occurred in any capacity other than in his official capacity and pursuant to his duties as the Chief Public Defender. As plaintiff was "routinely" involved in overseeing the proper docketing of juvenile matters, it is apparent that in addressing the failure of court administrative staff to expunge juvenile records from the court docket, the plaintiff was acting in his capacity as, and pursuant to his official duties as, the Chief Public Defender.

From the record before the court, there is no indication that the plaintiff was acting as a citizen when he attempted to obtain additional funding for the OPD or took steps to remedy the failure of court administrative staff to

24

expunge juvenile records as ordered by the court. The plaintiff was performing some of the very tasks for which he was hired and for which he admits he was responsible, i.e., to ensure adequate representation to indigent defendants both adult and juvenile,  and to manage the OPD, including its budget. In fact, the plaintiff indicates in his motion for a preliminary injunction that the defendants had no legitimate interest "in preventing the *Chief Public Defender* [not Al Flora, Jr., as a citizen] from taking every lawful step necessary to ensure that indigent defendants in Luzerne County are afforded constitutionally adequate representation." (Doc. No. 5, p. 8) (emphasis added). It is not the average citizen who would file a state court funding action in order to ensure that the OPD had adequate funding to provide indigent criminal defendants with adequate representation, nor is it the average citizen who would be in charge of overseeing the proper docketing of juvenile matters. Instead, the court finds that the plaintiff, pursuant to his duties as the Chief Public Defender, took these actions and, as such, was acting as a government employee, not a private citizen. His actions are therefore not protected by the First Amendment and the defendants' motion to dismiss will be granted with respect to this claim.

To the extent that the court finds that the plaintiff fails to state a First Amendment claim, the defendants argue that the court should decline to exercise supplemental jurisdiction over the plaintiff's state law wrongful termination and whistleblower claims. (Doc. No. 11, p. 12).

"Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 387 (1998) (citation and internal quotation marks omitted). "A district court can decline to exercise supplemental jurisdiction in several circumstances, including a situation where 'the district court has dismissed all claims over which it has original jurisdiction,' as in this case." Trinity Industries, Inc. v. Chicago Bridge & Iron Co., 775 F.3d 131, 135 (3d Cir. 2013) (quoting 28 U.S.C. §1367(c)(3)).

Here, the court is dismissing the only claim over which it had original subject matter jurisdiction, i.e., the First Amendment claim, and declines to exercise supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. §1367(c)(3). See Taggart v. Norwest Mortg. Inc., 539 F. App'x 42, 45 (3d Cir. 2013).

### b.    Plaintiff's Motion for Preliminary Injunction

In light of the fact that the court is dismissing the plaintiff's First Amendment claim for the plaintiff's failure to state a claim upon which relief can be granted and will not exercise supplemental jurisdiction over the state law claims, the plaintiff's motion for a preliminary injunction will be dismissed.

26

## IV.    CONCLUSION

On the basis of the foregoing, an appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Date:  March 10, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1049-01.wpd